UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

AQUILINE CAPITAL PARTNERS LLC,

               Plaintiff,               11 Civ. 3684

   -against-                      OPINION

FINARCH LLC, FINANCIAL ARCHITECTS NV,
and NIBC CAPITAL PARTNERS I B.V.,

               Defendants.

------------------------------------------X

A P P E A R A N C E S:

      Attorneys for Plaintiff

      WILLKIE FARR & GALLAGHER LLP
      787 Seventh Avenue
      New York, NY  10019
      By:  Thomas H. Golden, Esq.
          Daniel M. Burstein, Esq.

      Attorneys for Defendants

      MENZ BONNER & KOMAR LLP
      444 Madison Avenue, 39th Floor
      New York, NY  10022
      By:  Patrick D. Bonner, Jr., Esq.
          Michael S. Komar, Esq.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5-17-12

**Sweet, D.J.**

Defendants Financial Architects NV ("Financial Architects") and NIBC Capital Partners I B.V. ("NIBC Capital"), (collectively, the "Defendants"), have moved to dismiss the complaint brought by the plaintiff Aquiline Capital Partners LLC ("Aquiline" or the "Plaintiff") for lack of personal jurisdiction pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and on the grounds of <u>forum</u> <u>non</u> <u>conveniens</u> pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure.  Based on the facts and conclusions set forth below, the motion to dismiss for lack of jurisdiction is granted obviating the need to resolve the alternative motion.

The motion to dismiss for lack of jurisdiction presents a close question on these facts concerning the formation of the contracts between Aquiline, a New York-based private equity firm investing globally in financial services, Financial Architects, a Belgium company and NIBC Capital, a Netherlands company.  On all the facts and circumstances presented, dismissal without prejudice is the appropriate resolution of the issues presented.

I. **Prior Proceedings**

1

Aquiline filed its complaint on April 29, 2011 alleging breach of the Defendants' contractual obligations.  (Compl. ¶ 18). Aquiline and the Defendants executed three letter agreements relating to a proposed transaction in which Aquiline would acquire a controlling interest in Financial Architects, a Belgium company. (Compl. ¶¶ 8-9).  According to the complaint, the Defendants breached the terms of a September 24, 2010 letter agreement, as supplemented by letter agreements dated November 4, 2010 and December 7, 2010, which provided that in the event that Financial Architects chose not to proceed with the agreements, it would reimburse Aquiline for all of its legal fees and expenses without limitation.  (Compl. ¶¶ 9-11).  When the Defendants informed Aquiline in writing that they decided not to proceed with the transaction, Aquiline demanded reimbursement for its expenses, which Defendants rejected.  (Compl. ¶ 12, 14).  Aquiline now seeks damages in the amount of €580,686.24 or at least $855.060.49, based on current exchange rates.  (Compl. ¶ 18).

The instant motions were heard and marked fully submitted on October 5, 2011.

## II.  The Facts

2

The facts are set forth in the complaint and the affidavits submitted by the parties and are not in dispute except as noted below.

Aquiline is a limited liability company organized and existing under the laws of the State of Delaware, and having its principal place of business in New York, New York.  Aquiline is a private equity firm that, through its funds Aquiline Financial Services Fund I and Aquiline Financial Services Fund II, invests exclusively in financial services businesses and makes investments globally across a range of industries, including property and casualty insurance, asset management, banking, securities, life insurance and financial technology.

Defendant Financial Architects is a Belgian corporation headquartered in Merelbeke, Belgium.  Financial Architects does not maintain an office or other place of business in New York.  It does not have any bank accounts in New York nor does it possess any property, personal or real, in the state.

Financial Architects owns a subsidiary in the U.S., FinArch U.S. Inc., which is a Delaware corporation with its principal place of business located in Burlington, Massachusetts. Financial Architects, however, does not manage, fund or control

FinArch U.S. Inc.'s daily business operations and activities. FinArch U.S. Inc. maintains its own financial books and records and files its own U.S. tax returns.  The New York address in the August 5, 2011 press release, to which the parties have referred, is a residential home office address of an ex-employee of FinArch U.S. Inc.

Defendant NIBC Capital is the largest shareholder of Financial Architects.  The company is incorporated under the laws of The Netherlands and headquartered in The Hague.  NIBC Capital is a private equity fund manager that solely focuses on companies in the Benelux (Netherlands, Belgium and Luxembourg) and Germany. The company does not maintain an office or place of business in New York or elsewhere in the U.S., but has offices in Brussels, Frankfurt, London and Singapore.  NIBC Capital does not maintain a mailing address, telephone listings, any employees, bank accounts or personal property of any kind in the State of New York.  It does not market or solicit business or engage in any other persistent course of conduct in New York, and it does not derive substantial revenue from goods used or consumed or services rendered in the state.

On March 11, 2009, Deborah Bernstein ("Bernstein") of Aquiline contacted Dirk De Beule ("De Beule"), the Chief Executive

4

Officer of Financial Architects, by email in Belgium, expressing
interest in De Beule's company.  Bernstein inquired about
Financial Architects and whether the company had an immediate need
for capital.  De Beule responded that Financial Architects did not
currently have such a need but that he would be willing to
evaluate a future "potential liquidity event" for some of its
shareholders.  Over the next ten months, Bernstein in New York and
De Beule in Belgium exchanged several telephone and email
communications concerning Aquiline's interest in Financial
Architects.

        During an email exchange on June 25, 2010, Bernstein and
De Beule agreed to meet the next time Bernstein was in Belgium to
further develop the relationship between the two companies.  On
July 27, 2010, Bernstein and Mark Rodrigues ("Rodrigues"), a
colleague of Bernstein's from Aquiline, flew from New York to
Belgium to meet with De Beule to discuss a potential Aquiline
investment in Financial Architects.  After the meeting, De Beule
emailed Aquiline to express his continued interest in the
potential transaction.

        Two weeks later, De Beule, Bernstein and Nigel Lee, the
Chief Commercial Officer ("Lee") of Financial Architects, held a
call to discuss valuation expectations.  During the call,

Bernstein requested Financial Architects' 2011 financial forecast for review by Aquiline's Investment Committee.  Financial Architects provided the requested forecast, and Aquiline's Investment Committee gave preliminary approval to move forward with the transaction.

Another meeting took place between De Beule and Aquiline representatives on August 24, 2010 in Belgium to discuss the transaction.  Aquiline subsequently sent a preliminary due diligence list to Financial Architects.  Financial Architects responded with the requested information but asked for a Letter of Intent before September 4, 2010 in advance of their yearly strategic shareholders meeting.

On September 3, 2010, Aquiline prepared and transmitted a signed Letter of Intent to Financial Architects in Belgium. Financial Architects redrafted various revisions to the document in Belgium.  Subsequent negotiations concerning the contents and terms of the letter were emailed between the two parties and discussed over several telephone conferences from their respective offices in New York and Merelbeke.

At this time, Aquiline contacted NIBC Capital, Financial Architects' largest shareholder and largest selling shareholder in

6

the transaction, to clarify their offer.  Bernstein, with other

Aquiline representatives, initiated a call with Michel Verhoog

("Verhoog"), NIBC Capital's Investment Director.  After receiving

a copy of the proposed Letter of Intent, Verhoog prepared a number

of comments and revisions and send them to Aquiline via email.  At

no point, did Verhoog or any NIBC Capital representatives travel

to meet or negotiate with Aquiline in New York.  All negotiations

and communications as to the terms of the agreement were either

emailed or discussed over the phone by Verhoog from NIBC Capital's

offices.

On September 24, 2010, Aquiline forwarded a final,

executed Letter of Intent, (the "September 24 Letter"), to De

Beule and Verhoog.  The agreement stated that Aquiline had to

"take[ ] into consideration the applicable Belgian legal

requirements," and included an express choice of law clause that

provided the agreement and its terms "are governed by Belgian

law."  The September 24 Letter also expressly required approval by

the Aquiline Investment Committee as a condition to closing the

transaction.

On September 29, 2010, at Aquiline's request, De Beule,

Lee, and Leo Eelen, the Chief Financial Officer of Financial

Architects ("Eelen"), traveled to New York to make the

7

presentation to Aquiline's Investment Committee.  The purpose of
the meeting was to allow the committee to ask questions before
giving final approval for Aquiline's the potential investment in
Financial Architects in Belgium.

After the presentation and the Investment Committee's
approval was obtained, De Beule countersigned the September 24
Letter.  Bernstein forwarded the final, partially-executed letter
agreement to Verhoog.  On October 1, 2010, Verhoog executed the
agreement on behalf of NIBC Capital at its head office in the
Hague.  No negotiations or discussions with respect to the
September 24 Letter took place in New York and according to De
Beule the countersigning was "a ministerial task," which he had
initially testified took place in Belgium.  (De Beule Supp. Decl.
¶ 7, De Beule Decl. ¶ 11).

In late October 2010, the parties discussed valuation in
a series of phone calls between New York and Belgium.  As the
negotiations began to deteriorate, Aquiline sent a confirmation
letter (the "November 4 Letter") to Financial Architects and NIBC
Capital with respect to Aquiline's continued interest in Financial
Architects on November 4, 2010.  All discussions and negotiations
concerning the terms and contents of the November 4 Letter took
place on behalf of Financial Architects and NIBC Capital in

Merelbeke or the Hague.  De Beule executed the November 4 Letter in Belgium, which was thereafter executed by representatives of NIBC Capital at its offices.

At Aquiline's request, De Beule visited Aquiline's New York office on November 22 and 23, 2010.  While there, De Beule spoke with Bernstein and Rodrigues to discuss their shared priorities of trust and commitment to future growth plans. According to De Beule, these discussions did not relate to the negotiation or execution of any of the letter agreements at issue in this case.  Plaintiff contends that during De Beule's visit, the Aquiline deal team explained the company's hands-on approach to investing, the importance of the due diligence process, the need for mutual trust, and other certain specifics about Financial Architect's business and future plans.  Aquiline prepared the schedule of meetings for the remainder of De Beule's visit.  De Beule met with other Aquiline personnel, executive and industry advisors, and sat in on interviews for two candidates presented as potential post-transaction independent board members.

On December 1, 2010, Bernstein and Jason Ehrlich ("Ehrlich") of Aquiline met with De Beule and other representatives from Financial Architects in Merelbeke, to discuss Aquiline's due diligence process.  Subsequent to this December

9

meeting, Aquiline prepared, signed and sent a letter dated December 7, 2010 (the "December 7 Letter") to De Beule and Verhoog in Belgium to extend the exclusivity period in connection with the prior letter agreements.  Representatives from Financial Architects and NIBC Capital executed the December 7 Letter in Belgium.

In early March 2011, two representatives of Aquiline, Rodrigues and Lee Barb ("Barb") attended a meeting at Financial Architects' head office in Belgium to discuss various valuation issues as a means of moving forward with an investment in Financial Architects.  According to De Beule, after Aquiline's formal presentation, Financial Architects concluded that Aquiline was attempting to alter several of the fundamental assumptions with respect to its proposed controlling investment in Financial Architects.  As a result, further negotiations and discussions concerning any final agreement between the parties stalled.  When the Defendants notified Aquiline, in writing, of their intent to terminate the transaction, Aquiline requested that all incurred expenses be reimbursed under the terms of the letter agreement. Financial Architects and NIBC Capital refused financial remuneration, which precipitated this lawsuit.

## III. **The Jurisdictional Standard**

Once a defendant has raised a jurisdictional defense to a Rule 12(b)(6) motion to dismiss, the plaintiff bears the burden of proving sufficient contacts with the relevant forum to establish jurisdiction over each defendant.  Whitaker v. American Telecasting, Inc., 261 F.3d 196, 208 (2d Cir. 2001); Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994); Longwood Resources Corp. v. C.M. Exploration Co., 988 F. Supp. 750, 751 (S.D.N.Y. 1997).  Prior to discovery, a plaintiff may carry this burden "by pleading in good faith . . . legally sufficient allegations of jurisdiction, i.e., by making a 'prima facie showing' of jurisdiction."  Jazini v. Nissan Motor Co., 148 F.3d 181, 184 (2d Cir. 1998).  The plaintiff must satisfy its burden with respect to each defendant separately.  See Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 781 n.13, 104 S. Ct. 1473, 79 L. Ed. 2d 790 (1984) (citing Rush v. Savchuck, 444 U.S. 320, 332, 100 S. Ct. 571, 579, 62 L. Ed. 2d 516 (1980) ("The requirements of International Shoe . . . must be met as to each defendant over whom a state court exercises jurisdiction.")).

While plaintiffs at this stage need only make a prima facie showing that jurisdiction exists over each defendant, New York courts have granted a defendant's motion to dismiss where a plaintiff did "not alleged facts sufficient to support the

11

conclusion that defendants have performed acts by which they have purposely availed themselves of the benefits and protections of New York law." Longwood Resources, 988 F. Supp. at 752; see also Burrows Paper Corp. v. R.G. Engineering, Inc., 363 F. Supp. 2d 379, 383 (N.D.N.Y. 2005) (granting motion to dismiss where plaintiff's averment of facts was legally insufficient to establish jurisdiction over the defendant).

Aquiline has asserted specific jurisdiction over Financial Architects and NIBC pursuant to New York's long-arm status, CPLR 302(a)(1), alleging that each defendant "transacted substantial business within the State of New York, including the negotiation of the contract that is the subject of this action." Compl. ¶¶ 4-6. It is well established that "[t]he amenability of a foreign corporation to suit in a federal court in a diversity action is determined in accordance with the law of the state where the court sits, with federal law entering the picture only for the purpose of deciding whether a state's assertion of jurisdiction contravenes a constitutional guarantee." Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996). Thus, to determine whether specific personal jurisdiction exists over the non-domiciliaries in this case, "the court must look first to the long-arm statute of the forum state, in this instance New York." Whitaker, 261 F.3d at 208.

12

New York Long-Arm Jurisdiction

New York law mandates a two-part jurisdictional
analysis.  "First, it must determine whether the plaintiff has
shown that the defendant is amenable to service of process under
the forum state's laws; and second, it must assess whether the
court's assertion of jurisdiction under these laws comports with
the requirements of due process."  Metro. Life Ins. Co., 84 F.3d
at 567; see also Bank Brussels Lambert v. Fiddler Gonzalez &
Rodriguez, 305 F.3d 120, 124 (2d Cir. 2002).

New York's long-arm statute, CPLR 302(a)(1), permits
"jurisdiction over any non-domiciliary . . . who in person or
through an agent . . . transacts any business within the state or
contracts anywhere to supply goods or services in the state."  In
applying the long-arm statute, "New York courts have cautioned . .
. that 'defendants, as a rule, should be subject to suit where
they are normally found, that is, at their pre-eminent
headquarters, or where they conduct substantial business
activities.  Only in a rare case should they be compelled to
answer a suit in a jurisdiction with which they have the barest of
contact.'"  Hutton v. Priddy's Auction Galleries, 275 F. Supp. 2d
428, 439 (S.D.N.Y. 2003) (citing McKee Elec. Co. v. Rauland-Borg

13

Corp., 20 N.Y.2d 377, 383, 283 N.Y.S.2d 34, 229 N.E.2d 604
(1967)). In New York, a plaintiff may exercise "personal
jurisdiction over a nondomicilary if two conditions are met:
first, the non-domicilary must 'transact business' within the
state; second, the claims against the nondomicilary must arise out
of that business activity." CutCo Indus., Inc. v. Naughton, 806
F.2d 361, 365 (2d. Cir. 1986); see also Beatie & Osborn LLP v.
Patriot Scientific Corp., 431 F. Supp. 2d 367, 387 (S.D.N.Y.
2006).

To establish that a non-domiciliary is transacting
business in New York, a plaintiff must show that the defendant
"purposefully avail[ed itself] of the privilege of conducting
activities within New York, thus invoking the benefits and
protections of its laws." Id.; Beatie, 431 F. Supp. 2d at 387.
Not all purposeful activity, however, constitutes a "transaction
of business" within the meaning of Section 302(a)(1). Rather,
contacts with New York have been found to sustain personal
jurisdiction only where a "defendant's direct and personal
involvement . . . on his own initiative . . . project[ed] himself"
into New York to engage in a "sustained and substantial
transaction of business." Parke-Bernet Galleries v. Franklyn, 26
N.Y.2d 13, 18, 308 N.Y.S.2d 337, 256 N.E.2d 506 (1970).

14

The Second Circuit Court of Appeals has identified the
following unexhaustive list of relevant factors to consider in
determining whether an out-of-state defendant transacts business
in New York under CPLR 302(a)(1):

> (1) whether the defendant has an on-going contractual
> relationship with a New York corporation, (ii) whether
> the contract was negotiated or executed in New York, and
> whether after executing a contract with a New York
> business, the defendant has visited New York for the
> purpose of meeting with parties to the contract
> regarding the relationship (iii) what the choice-of-law
> clause is in any such contract, and (iv) whether the
> contract requires franchisees to send notices and
> payments into the forum state or subjects them to
> supervision by the corporation in the forum state.

Agency Rent A Car Sys. v. Grand Rent A Car Corp., 98 F.3d 25, 29
(2d Cir. 1996) (internal citations omitted).  Although all the
factors "are relevant, no one factor is dispositive.  Other
factors may also be considered," in the court's ultimate
determination.  Id.  "No single event or contact connecting
defendant to the forum state need be demonstrated;" Cutco Indus.
Inc., 806 F.2d at 365, rather "[a] court must look at the totality
of circumstances to determine the existence of purposeful activity
and may not subject the defendant to jurisdiction based on
'random,' 'fortuitous,' or 'attenuated' contacts." PaineWebber
Inc. v. WHV, Inc., No. 95-0052(LMM), 1995 WL 296398, at *2
(S.D.N.Y. May 16, 1995).  Thus, "it is the 'nature and quality'

15

and not the amount to New York contacts which determine the purposeful activity." Id.

## IV.  **Analysis**

The Defendants assert that the complaint fails to allege facts that it "transacted any business in the State of New York, and in fact Defendants did not transact business in New York." (Def. Motion at 14) (emphasis in the original).  In response, Aquiline contends that the Defendants far exceeded the remote and in-person "minimum contacts required to confer jurisdiction." (Pl. Opp. at 15).  Aquiline places significant reliance on the negotiation and execution of the "Letters of Intent containing binding provisions for the reimbursement of Aquiline's expenses." (Id.).  Taking all contacts between the Defendants and Aquiline into account, even if all the allegations of the complaint and the affidavits are accepted as true, there is no basis on which to assert jurisdiction over either Financial Architects or NIBC Capital.

Jurisdiction Over Financial Architects Has Not Been Established

Since the "mere existence of a contract with a New York corporation is not sufficient to constitute the transaction of business under section [302(a)(1)] of the CPLR," the three letter agreements must be considered along with other factors in order to determine whether Financial Architects transacted business in New York.  See Pieczenik v. Cambridge Antibody Tech. Group, No. 03-6336(SAS), 2004 WL 527045, at *4 (S.D.N.Y. Mar. 16, 2004).  The "existence of personal jurisdiction is, in the end, evaluated on an individual basis, based on a "unique set of facts and circumstances."  Schomann Int'l Corp. v. Northern Wireless, Ltd., 35 F. Supp. 2d 205, 209 (N.D.N.Y. 1999).

In considering the first factor, "New York courts . . . have adopted a prospective analysis in determining whether an ongoing contractual relationship exists."  Id.  "[T]emporary, random, or tenuous relationships with [New York]" does not constitute a continued business relationship.  Agency Rent A Car Sys., 98 F.3d at 30.  Courts have found such relationships where the business lasted or was expected to last over several years.  See e.g., Id. (continual business relationship over three decades constituted on-going contractual relationship); George Reiner & Co., Inc. v. Schwartz, 41 N.Y.2d 648, 653, 394 N.Y.S.2d 844, 363 N.E.2d 551 (N.Y. 1977) (four-year employment contract contemplated and resulted in continuing relationship between [the parties]).

17

On the other hand, where completion of the obligations in a contract would end the contractual relationship between the parties, courts have found no ongoing relationship. See Burrows Paper Corp., 363 F. Supp. 2d at 385. Here, the letter agreements at issue were the only transactions the Defendants entered into with Aquiline, and they had no other prior or subsequent business dealings. However, the facts indicate that the Defendants maintained a relationship with Aquiline for over two years (Bernstein Decl. ¶ 3). Therefore, the first factor weighs in Aquiline's favor of finding jurisdiction.

As to the second factor, Aquiline points out that the Financial Architects' executives "visited Aquiline's office in New York on four separate occasions to advance their relationship" and "indeed to execute a contract." (Pl. Opp. at 15-16). Financial Architects maintains that all of the letter agreements were negotiated and signed by each defendant entirely outside New York, except for the signing of the September 24 Letter by De Beule in New York (Def. Motion at 14). Physical presence, however, is neither dispositive nor critical to establishing personal jurisdiction. See Agency Rent A Car Sys., Inc., 98 F.3d at 30-31 (questioning whether "in an age of e-mail and teleconferencing, the absence of actual personal visits to the forum is any longer a critical consequence."). Accordingly, Financial Architects other

18

contacts with New York during the negotiation and execution of the letter agreements are relevant.

Although principals of Financial Architects attended meetings with Aquiline in New York at Aquiline's request, those meetings did not involve the drafting or negotiation of any letter agreements at issue.  (De Beule Supp. Decl. ¶ 7; De Beule Decl. ¶ 12).  While De Beule was present during the execution of the September 24 Letter and visited Aquiline's New York office subsequent to its signing, those meetings also did not involve drafting or negotiations.  New York courts have held that such exploratory meetings taking place in New York, "leading to nothing more than a proposal that was itself the subject of further negotiations over the phone, by mail, and in meetings outside New York," are not sufficient contacts to constitute the transaction of business within the meaning of CPLR 302(a)(1).  C-Life Group Ltd. v. Generra Co., 235 A.D.2d 267, 652 N.Y.S.2d 41 (1st Dep't 1997).  All subsequent supplemental letter agreements were also negotiated and indisputably executed in Belgium.  (Bernstein Aff. ¶ 16, Exs. C and F; De Beule Supp. Decl. ¶ 7; De Beule Decl. ¶ 16).

Aquiline also argues that Financial Architects' executives projected themselves into New York via repeated phone

calls and emails.  Courts have consistently held, however, that

such correspondence with New York does not support the exercise of

personal jurisdiction where the undisputed facts demonstrate that

the defendant "did not seek out a New York forum."  Pryor,

Cashman, Sherman & Flynn v. Haisfield, No. 90-3586(RWS), 1990 WL

165687, at **2-3 (S.D.N.Y. Oct. 26, 1990) (finding two meetings in

New York and telephone calls and correspondences from Florida to

New York insufficient to confer jurisdiction); PaineWebber Inc. v.

Westgate Group, Inc., 748 F. Supp. 115, 119 (S.D.N.Y. 1990)

(holding that the defendant did not project itself into New York

by sending numerous telecopies and faxes to plaintiff's New York

offices where preliminary discussions and negotiations took place

in Texas); WHV, Inc., 1995 WL 296398 at *3 (finding telephone

calls and occasional exploratory, unproductive or insubstantial

meetings in New York lacking the requisite "nature and quality" to

constitute "transacting business"); Current Textiles Corp. v. Ava

Indus., Inc., 624 F. Supp. 819, 820 (S.D.N.Y. 1985) (stating that

under the Second Circuit's Lehigh test, only in-forum negotiations

that "substantially advance" or are "essential" to formation of

business agreement will support a legally sufficient basis for

jurisdiction.).


        In addition, while the Plaintiff cites to several cases

supporting a finding of personal jurisdiction, these cases were

based on facts where the defendant solicited and initiated
business in New York.  (Pl. Opp. at 14, 17).  See e.g., Fischbarg
v. Doucet, 9 N.Y.3d 375, 385, 880 N.E.2d 22, 30 (2007) (defendant
deliberately reached out to and retained a New York law firm to
derive benefits of the New York plaintiff's on-going
representation, thereby projecting himself into the New York legal
services market and giving rise to the dispute at issue); Deutsche
Bank Sec., Inc. v. Montana Bd. of Investments, 7 N.Y.3d 65, 71-72,
850 N.E.2d 1140, 1143 (2006) (defendant initiated and pursued
negotiations with the plaintiff's employee in New York, engaged in
approximately eight other transactions with the plaintiff and such
transactions were central to defendant's operations); Parke-Bernet
Galleries, 26 N.Y.2d at 18 (defendant sent a letter to the
plaintiff stating his desire to bid in a New York action, then
actively participated and bid over an open telephone line
throughout the entire transaction); George Reiner & Co., Inc. v.
Schwartz, 41 N.Y.2d 648, 363 N.E.2d 551 (1977) (defendant
purposefully sought employment in New York, responded to
plaintiff's ad, travelled to interview in the state, and was
physically present in New York to negotiate and execute a contract
that would establish a continuing relationship between the
parties).  Here, Aquiline reached out to and solicited the
Defendants in Belgium to pursue the acquisition of a controlling
interest in Financial Architects, a Belgian company.  (Bernstein

21

Aff. ¶ 4, 7; De Beule Decl. ¶ 5, 7).  Only after Aquiline pursued
Financial Architects over several months, did any or drafting
negotiations begin.  (Bernstein Aff. ¶ 4, 7; De Beule Decl. ¶ 5,
7).

      A choice of law provision is another factor, which
standing alone, "does not constitute a voluntary submission to
personal jurisdiction." CutCo Industries, Inc., 806 F.2d at 366.
However, the Supreme Court has held that such clauses are relevant
and should not be ignored when making a determination regarding
jurisdiction.  See Burger King v. Rudzewicz, 471 U.S. 462, 482,
105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985); see also Agency Rent A
Car Sys. 98 F.3d at 29 (the Second Circuit finding a choice-of-law
clause relevant in determining whether an out-of-state defendant
transacted business in New York.).  Here, the letter agreements
specifically included a choice of law provision stating that the
agreements and any disputes were governed by Belgian, not New
York, law.

      The fourth factor, which concerns the sending of notices
and payment into the forum state or supervision in the forum
state, is inapplicable to the facts of this case and therefore a
neutral factor in deciding whether Financial Architects transacted
business in New York.

In addition, for the first time in its opposition brief, the Plaintiff contends that Financial Architects is also subject to general jurisdiction in New York.  Compare Pl. Opp. at 12-13, and Compl. ¶ 5 (alleging only specific jurisdiction over Financial Architects).  Unlike specific jurisdiction, which exists when "a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum[,]" Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-16, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984), a court's general jurisdiction is "based on the defendant's general business contacts with the forum state and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts."  Metro. Life Ins. Co., 84 F.3d at 568.  Courts impose a more stringent minimum contacts test, requiring the plaintiff to demonstrate that the defendant engaged in continuous, systematic, permanent and substantial activity in New York.  See Helicopteros, 466 U.S. at 415-16 (1984); J.L.B. Equities, Inc. v. Ocwen Fin. Corp., 131 F. Supp. 2d 544, 547-48 (S.D.N.Y. 2001).  Occasional or sporadic contacts with New York will not suffice.  Landoil Resources Corp. v. Alexander & Alexander Servs., 77 N.Y.2d 28, 34, 565 N.E.2d 488, 490 (1990) (non-resident must maintain contact with New York "not

occasionally or casually, but with a fair measure of permanence and continuity.").

Financial Architects is a corporation organized under the laws of Belgium with its headquarters in Belgium.  It does not maintain an office, a post office box, a bank account or phone listings in New York.  It also has no registered agent for service of process in the state nor does it maintain any employees or property of any kind in New York.  (Id.); See Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 98 (2d Cir. 2000) (finding that the focus should be on a "traditional set of indicia:  for example, whether the company has an office in the state, whether it has any bank accounts or other property in the state, whether it has a phone listing in the state, whether it does public relations work there, and whether it has individuals permanently located in the state to promote its interests.").

Although its subsidiary, FinArch U.S. Inc., is registered with the New York Secretary of State and has conducted some business in the state, Financial Architects does not manage, fund or control the subsidiaries daily business operations and activities.  The subsidiary maintains its own finances and files its own taxes.  Any New York contacts of Financial Architects' subsidiary cannot be imputed to its parent Financial Architects

24

because they are separate legal entities.  Kern v.

Oesterreichische Elektrizitaetswirtschaft Ag, 178 F. Supp. 2d 367,

377 n.14 (S.D.N.Y. 2001) (stating that a subsidiary, even if

wholly-owned, "is nevertheless a separate corporate entity from

its parent for purposes of liability, unless a showing to the

contrary is made.").

In assessing the totality of Financial Architect's acts

in New York, even where the pleadings and affidavits are construed

in a light most favorable to the Plaintiff, they do not constitute

substantial activity sufficient to establish specific or general

jurisdiction.

Additionally, the due process requirements for personal

jurisdiction, "protects a person without meaningful ties to the

forum state from being subjected to binding judgments within its

jurisdiction."  Metro. Life Ins. Co., 84 F.3d at 567.  To satisfy

due process requirements, a state may constitutionally exercise

jurisdiction over non-domiciliary defendants, provided (1) that

such defendants have "certain minimum contacts" with the forum

state and (2) that the maintenance of a suit does not offend

"traditional notions of fair play and substantial justice."  Int'l

Shoe v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95

(1945) (quoting Miliken v. Meyer, 311 U.S. 457, 463 (1940)).  The

25

test for "minimum contacts" has come to rest on whether a
defendant's "conduct and connection with the forum state" are such
that a defendant "should reasonably anticipate being hauled into
court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S.
286, 297, 100 S. Ct. 559, 62 L. Ed. 2d. 490 (1980). The "minimum
contacts" test protects a defendant against the burdens of
litigating in a distant and inconvenient forum. Id. at 292.


Moreover, minimum contacts alone do not satisfy due
process. Drake v. Laboratory Corp. of Am. Holdings, No. 02-1924,
2008 WL 4239844, at *4 (E.D.N.Y. Sept. 11, 2008). Even if a
defendant has minimum contacts, the prospect of defending a suit
in the forum state must also comport with traditional notions of
fair play and substantial justice. Metro. Life Ins. Co., 84 F.3d
at 568; Drake, 2008 WL 423944, at *4; LaMarca v. Pak-mor Mfg. Co.,
95 N.Y.2d 210, 217, 713 N.Y.S.2d 304 (2000) (citing Burger King
Corp. v. Rudzewicz, 471 U.S. 462, 476 (1985)). The United States
Supreme Court has articulated the following test to determine
whether the exercise of personal jurisdiction comports with
traditional notions of fair play and substantial justice:

> A court must consider the burden on the defendant, the
> interests of the forum state, and the plaintiff's
> interest in obtaining relief. It must also weigh in its
> determination the interstate judicial system's interest
> in obtaining the most efficient resolution of

26

controversies; and the shared interest of the several
States in furthering fundamental substantive social
policies.

Asahi Metal Indus. Co. v. Super. Ct. of Cal., 480 U.S. 102, 113
(1987) (internal citation omitted); see also Drake, 2008 WL
4239844, at *5 (mere fact that defendant's dealings with New York
resident would impact plaintiff in forum state is insufficient,
since foreseeable consequences "has never been a sufficient
benchmark for personal jurisdiction under the Due Process
Clause.").


Here, even assuming that Financial Architects had
sufficient minimum contacts with New York, subjecting the company
to jurisdiction in the state would not satisfy the requirements of
due process.  The Defendants are foreign companies that had no
prior relevant contact with Aquiline in New York.  (De Beule Decl.
¶¶ 1, 3; Verhoog Decl. ¶¶ 1-3).  All of the Defendant's relevant
representatives reside in Belgium and the Hague.  (De Beule Decl.
¶ 19).  Thus, it would be time-consuming and financially onerous
for the Defendants to travel to New York for trial.  In addition,
all of Financial Architect's relevant documents, records and other
evidence are also located in Belgium, and some of these materials
would need to be translated from Flemish.  (De Beule Decl. ¶20).

27

Aquiline also initiated contact between the companies and interjected itself into Belgian affairs by seeking to acquire a controlling interest in the Belgian company. (De Beule Decl. ¶¶ 4-9; Verhoog Decl. ¶ 4). There is no evidence that the Defendants could have foreseen being led to court in New York in connection with a proposed transaction in Belgium that expressly provided that they would be governed by Belgian law. Plaintiff has not shown that the Defendants had sufficient minimum contacts with New York to exercise personal jurisdiction over them without violating due process and offending traditional notions of fair play and substantial justice.

Jurisdiction Over NIBC Has Not Been Established

With respect to NIBC Capital, Aquiline has not cited to a New York contact of jurisdictional significance. As noted above, the Plaintiff has not contested the facts set forth in the Verhoog Declaration. While Plaintiff alleges that NIBC Capital sent certain emails and faxes to New York in response to Aquiline's solicitation of business in Belgium, those sporadic contacts are not sufficient to establish specific jurisdiction over NIBC Capital. See, e.g., Pryor, Cashman, Sherman & Flynn v. Haisfield, 1990 WL 165687, at **2-3 (holding that two meetings in

28

New York and numerous telephone calls and correspondence to New York were not sufficient to confer jurisdiction).

Bernstein acknowledges in her affidavit that she reached out to and contacted NIBC Capital in the Netherlands (Bernstein Aff. ¶ 10), subsequently forwarded the partially-executed September 24 Letter to Verhoog in the Netherlands for final execution (Bernstein Aff. ¶ 14), and later sent a partially-executed supplemental Letter of Intent to NIBC Capital in the Netherlands.  (Bernstein Aff. ¶ 16).  Additionally, all comments and negotiations were prepared by NIBC Capital in Netherlands and each of the three letter agreements were executed on behalf of NIBC Capital in the Netherlands.  (Verhoog Aff. ¶ 7, 8, 9).

Given that NIBC Capital is incorporated under the laws of the Netherlands, headquartered in the Hague and maintains no office of place of business in New York or anywhere else in the U.S., together with the fact that the Plaintiff failed to allege the existence of a single jurisdictionally significant contact between NIBC Capital and York, NIBC's motion to dismiss based on lack of personal jurisdiction is granted.

## V. **Conclusion**

29

Based on the facts and conclusions set forth above, the Defendants' motion to dismiss the complaint for lack of personal jurisdiction is granted.

It is so ordered.

New York, NY
May /6 , 2012

ROBERT W. SWEET